IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                        No. 12 CR 0055 MV

YARIV OHAYON,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** is before the Court on Defendant Yariv Ohayon's Motion to Suppress Evidence and Memorandum in Support Thereof (Doc. 50) and Motion to Suppress Statement and Memorandum in Support thereof (Doc. 51). The Court held a hearing on the motions on July 12, 2012. The Court has considered the motions, briefs, the parties' arguments, and the relevant law, and being otherwise fully informed, **FINDS** that both motions shall be **DENIED** for the reasons stated herein.

**BACKGROUND**[1]

On the evening of December 15, 2011, DEA agents executed a search warrant at the apartment of an individual, hereinafter identified as "the confidential source" or "the CS." They seized 669 grams of heroin, a firearm, and $4000 in United States currency, after which the CS agreed to cooperate with agents. The CS told agents that he was planning to return five ounces of the heroin to his source of supply. He described the source of supply as an individual named

---

[1] A number of facts are in dispute. The Court will examine those relevant disputed facts in further detail in the section titled "Discussion," *infra*.

"Yuriv,"[2] who was either Pakistani or Israeli, but looked like a short Hispanic male.  The CS also informed agents that "Yuriv" drove a black Hummer H2.  The CS agreed to make a recorded call to "Yuriv," who agents later identified as Defendant Yariv Ohayon.  Defendant's voice is not audible on the recording, but agents heard the CS ask whether Defendant "wanted to take the five back in the stack."  Response (Doc. 54) at 2.  The CS then asked Defendant whether "after this[,] they'll definitely make them stronger?"  *Id*.  The CS then asked, "They're putting pressure on you?"  *Id*.

Although it appears from the partially inaudible recording that Defendant was reluctant to meet the CS that evening and preferred to wait until the following day, after significant persistence on the CS's part, the two agreed to meet in a Wal-Mart parking lot.  The ostensible purpose of this meeting was for Defendant to give the CS a jump start, as he was experiencing car troubles.  When Defendant arrived in his black Hummer H2, he called the CS, who told Defendant to walk towards the Wal-Mart entrance.  At approximately 10:45 p.m., Defendant – who matched the physical description the CS had provided to agents – exited his car and several agents then placed him under arrest.  The agents had their weapons drawn, but returned them to their holsters after Defendant was in custody.

While several agents secured the scene, two agents spoke with Defendant.  Defendant provided written consent for the agents to search his residence.  Agents did not locate any narcotics in Defendant's home, but they did find ledgers that they determined were consistent with pay/owe sheets.  When at Defendant's home, agents administered *Miranda* warnings, which Defendant waived.  Defendant denied any involvement in drug trafficking and told agents that he earned income doing side jobs in flooring and construction of speakers.  He further stated that he

---

[2] This spelling is derived from the law enforcement reports and does not reflect the CS's spelling.

was making speaker boxes for the CS, and had arranged to meet the CS to return five speaker boxes.  Defendant claimed the pay/owe sheets pertained to money owed for speaker boxes. Although agents observed a pair of speakers in Defendant's home, they found no tools or electronic parts to indicate that Defendant regularly assembled or sold speakers.

After the agents searched Defendant's residence, they transported him to the DEA office. At approximately 2:00 a.m., agents again administered *Miranda* warnings, and Defendant again waived his rights.  For roughly 40 minutes, the agents pressed Defendant regarding his involvement in drug trafficking, and he continued to deny any such involvement.  For example, they told him that they knew that the term "speakers" was code for drugs, but Defendant denied this.  As the agents were terminating the interview, Defendant confessed that he was dealing heroin.  He described himself as a "money man" who does not normally handle the drugs, but rather acts as an intermediary.  He provided further details about his involvement in drug trafficking, including that he had ties to the Los Padillas gang of Albuquerque and the Juarez drug cartel.

## DISCUSSION

Defendant argues that his arrest was unlawful under the Fourth Amendment because the arresting officers lacked probable cause to believe that he had committed an offense.  He argues that all evidence the officers discovered as a result of the arrest, as well as all of Defendant's post-arrest statements, must be suppressed as fruit of the poisonous tree.  He further argues that the officers' interrogation tactics amounted to undue coercion in violation of the Fifth Amendment, requiring suppression of his post-arrest confession.

I.      **Motion to Suppress Evidence**

A.      **Applicable Law**

An arrest is reasonable under the Fourth Amendment only if it is supported by probable

cause. *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012). "Probable cause exists where the

facts and circumstances within the arresting officer's knowledge and of which they had

reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable

caution to have the belief that an offense has been or is being committed by the person to be

arrested." *Koch v. City of Del City*, 660 F.3d 1228, 1239 (10th Cir. 2011). "Probable cause is

measured against an objective standard of reasonableness and may rest on the collective

knowledge of all officers involved in an investigation rather than solely on the knowledge of the

officer who made the arrest." *United States v. Zamudio-Carrillo*, 499 F.3d 1206, 1209 (10th Cir.

2007). "While an effort to fix some general, numerically precise degree of certainty

corresponding to probable cause may not be helpful, it is clear that only the probability, and not a

prima facie showing, of criminal activity is the standard of probable cause." *Illinois v. Gates*, 462

U.S. 213, 235 (1983). The Government bears the burden of proving that Defendant's arrest was

reasonable under the Fourth Amendment. *United States v. Chavez*, 534 F.3d 1338, 1343 (10th

Cir. 2008).

B.      **Defendant's Arrest Was Reasonable**

Defendant argues that the information the CS provided to agents was insufficient and

inadequately corroborated to establish probable cause. The agents lacked evidence that

Defendant planned to retrieve five ounces of heroin, failed to observe him pick up any heroin,

and did not wait for him to exchange heroin with the CS, but rather arrested him when he exited his vehicle.

The Government argues that the totality of the circumstances did indeed establish probable cause.  In its response to Defendant's motion, the Government highlighted the fact that the CS, whose identity was known to the agents, identified "Yuriv" as his source of supply, and told agents that he planned to return five ounces of heroin to "Yuriv."  Agents then listened to a telephone conversation between Defendant and the CS in which they used language that appeared to be code for drug transactions.  Finally, the CS gave agents particular information about "Yuriv," including his physical description and a description of the vehicle he would be driving.  The Government argues this information, combined with Defendant's arrival at Wal-Mart at the time and in the vehicle that the CS indicated, established probable cause.

In addition to these supporting facts, at the hearing the Government introduced cell phone records documenting text message exchanges between the CS and the telephone number that he claimed belonged to Defendant.  Officer Jonathan Reyes, a DEA task force officer with the New Mexico State Police, testified that he and his co-case agent had a misunderstanding regarding the discovery in this case, and for that reason they had not disclosed the cell phone records to the Government until the day before the hearing.  However, he clarified that although the parties had only received the text messages the previous day, the arresting officers reviewed them prior to arresting Defendant.  Shortly after executing the search warrant on the CS's apartment, the officers confiscated the CS's two telephones and reviewed text message exchanges that the CS claimed to be between himself and Defendant.  The number the CS claimed was Defendant's was listed in the CS's older phone as "Ur," and in his newer phone as "Yariv."

According to Officer Reyes, at the time of the CS's arrest, he told officers that the text messages between himself and Defendant concerned heroin.  They used the term "speakers" as code for heroin.  The messages concerned the CS's wish to return five ounces of heroin to Defendant, because it was of weak quality and he was unable to sell it.  The officers reviewed the text messages on the CS's phone and concluded that they were consistent with the information the CS provided.

The Court has read the text messages and agrees that they support the CS's assertion that he and the person with whom he was exchanging messages were discussing the CS's wish to return the heroin due to dissatisfied customers, in lieu of paying a debt he owed for the heroin. The relevant portions of the messages, which include ample misspellings and profanity, with particularly pertinent portions italicized, are below:

Ur:     Ok..brother pls let's get back on track brother I like workin with you and ur good hommie to kick it with..

…

CS:     Dude im sd o fucking fed up. I swear if this cat plays me im going to do some fucked up shit so everybody understands what time it is . . . . This fucking guy ….. Theres no fucking reason why he Isnt answering besides that he is fucking around. He Hasmy paper n some stuff . Ima try n not snap till I know foresure he is fucking me

Ur:     OK… iam holdn these guys back as much as possible brother ..I had u word so pls no games …

CS:     Dude I dont fear no fucking man if that's what ur tryn to say by holding them back. If u think um lieing or they do let me know kuz I have no fucking problem getting s Down the way I know how too. I keep callinf n calling this fucking guy. Im straped the fuck up n will go to this fucking guys baby momas tomorrow if he dont contact me

Ur:     Bro no iam just sayin ther up my ass ….not threaten you at all bro they just want ther paper bro…

CS:     So do I man I dont know exactly what to do this second. Time is going by so fucking slow n ive called n text this guy so many times.

Ur:     Hommie *I trusted u I kept fronting to u* just do the right thing

CS:     Im tryn , I really am tryn as hard as I can.  Im stressing out bad

Ur:     Iam stressing bro

. . .

Ur:   Talk to me brother whts up.
CS:   not much, buddy isn't around he stalled me by telling me he would meet me n now sayn sorry but I moved outa town shit but I dont think he did. So im with my people from valley tryn to track him down
…
Ur:   Bro I need to pay these guys something…
Ur:   Evryday ur telling me something … We need to get payed bud.. This isnt cool iam trusting you brother
CS:   I cant do something I dont have man., ill run over here n see if I cant pick a few bills.
Ur:   *I gave u the work* brother thats not cool.
…
Ur:   Get togeather as much paper so they can see ur making payments
CS:   Im just gonna say this too to be honest.,*the stuff is way to weak* so,with that n them other two losses is why im hurting bad. N *if u think im playn on how weak It is we can go to valley n watch effects of ur speakers n other speakers that r way cheaper that get way louder.* These guys gave me a hard time wgen I said wjat I paid.
Ur:   Bro it was good ….then go with them just pay yr bill and everything will be good its only right…be man of ur word I was.. *We need to make arrangements to make payments* pls I don't need this problem in my life brother..
CS:   Ok ill see,u around 7. The speakers u charge 125, 12, 105 they got for 7750 n 8.
Ur:   *Bro if it was weak then u would of brought it back*…so do act like this ….u need to get this right and pay this bill..
CS:   This has nothing to di,with how weak it is I told u I took two losses also n I been telling u *I been loosing people due to quality*
Ur:   Then u shoulnt of took the last one..just be straight up they will work with u just show payments…
…
Ur:   *Bro just get the shit back and well give u something better or lets make arangments to pay* … Brother we are busniess men we will work with u… we can work this out seriously …
…
Ur:   Talk to me whts up
…
CS:   A lil bit behind but am meeting u 100%. Just dealing with a few disloyal fucks.
Ur:   K
CS:   I am so sickof peoplr I cant trust.having homicidle thoughts man
Ur:   Let's pls get things right brother…

Gov't Ex. 4.

Following these excerpted messages, the phone records set forth four additional messages that, to the best of Officer Reyes's recollection, the CS and Defendant exchanged while the CS was in the car on the way to Wal-Mart.  However, having reviewed the time and date stamps of the messages provided, the Court has identified a discrepancy between the time on the phone records and the time the officer stated the messages were exchanged.  According to the phone records – which neither party reviewed until the day before the suppression hearing – the messages were exchanged between 4:51 a.m. and 6:07 a.m. Greenwich Mean Time (GMT) on December 15, 2011.  This translates to 10:51 p.m. on December 14, 2011 through 12:07 a.m. on December 15, 2011, Mountain Time.  This means that the final messages in Government's Exhibit 4 were exchanged roughly 24 hours before Defendant's arrest, rather than in the car on the way to Wal-Mart.

Although the time and date stamps on the cell phone records contradict Officer Reyes's contention that the final messages were exchanged while the officers and the CS were driving to Wal-Mart, the Court has concluded that this does not generally undermine the officer's testimony.  Throughout his testimony, Officer Reyes appeared to be a credible witness.  Based on the last-minute nature of the Government's discovery of the cell phone records, neither party had adequate time to review them as closely as would have been ideal.  Particularly because the CS had two telephones in which he had programmed Defendant's phone number, it appears that some confusion resulted about when particular messages were sent.  The Court has not relied upon the final messages that Officer Reyes believed were exchanged while driving to Wal-Mart, as these messages are not crucial for purposes of the probable cause determination.  Given the Government's burden of proof at this stage in the proceedings, the Court is not persuaded by the

defense's suggestion that the confusion over times and dates demonstrates that officers lacked

sufficient evidence connecting Defendant to the telephone number with which the CS was

exchanging messages.  Rather, the Court finds that the recorded call to the phone number in

question, followed by Defendant's arrival at the Wal-Mart parking lot, satisfies the

Government's burden of showing that the arresting officers had probable cause to believe that

Defendant was indeed the person with whom the CS was exchanging messages.

The messages excerpted above contribute substantially to the probable cause calculus,

and strongly support the CS's statements to officers that the exchange was in reference to heroin.

The messages make clear that although the parties are overtly discussing "speakers," this term is

an obvious code word for something much more valuable than speakers.  The CS is angry that an

individual who has the CS's money appears to be avoiding him (so angry, in fact, that he plans to

threaten the mother of this person's child with a gun, and is generally contemplating killing

someone); both parties are "stressing" about the missing money; and "Ur" claims to be

restraining others from harming the CS due to the debt he owes them.  The tone of this exchange

makes clear that the parties are discussing a highly valuable commodity for which they and/or

others are willing to commit acts of violence.

The arresting officers considered these messages in combination with the information

provided by the CS to reasonably conclude that the person with whom the CS was exchanging

text messages was involved in the sale of heroin.  The CS then agreed to call this person and

attempt to arrange a meeting with him for purposes of returning five ounces of heroin.  The CS

called the same phone number associated with the text messages the officers had read.  The

officers recorded the call, but could make out little, if any, of what the person on the other end of

the line said.  Nonetheless, they heard the CS tell the person that he wanted to "take five back" to

him.  They also heard the CS ask "they're putting pressure on you?" in a manner that suggested

he was repeating the other person's statement.[3]  They observed the CS attempt to arrange a

meeting with the person on the other end of the line, who was reluctant to meet that night, but

rather suggested meeting the next day.  After the CS's persistence, the person agreed to meet the

CS in the Wal-Mart parking lot, and the officers then saw someone who matched the CS's

description arrive at Wal-Mart in a black Hummer – the vehicle the CS predicted Defendant

would be driving.  At the hearing, Officer Reyes testified that Hummers are not commonly seen

on roadways, and Agent Rodriguez testified that no other Hummers were present in the parking

lot prior to Defendant's arrival.  This further supports the officers' conclusion that the driver of

this vehicle was indeed the individual involved in the text message exchange.  The officers'

decision to arrest Defendant upon his exit from the vehicle was reasonable.  Under these

circumstances, "a person of reasonable caution [would believe] that an offense has been or is

being committed by the person to be arrested."  *Koch*, 660 F.3d at 1239.

      To support his assertion that the officers lacked probable cause to arrest him, Defendant

emphasizes the fact that the officers failed to allow Defendant and the CS to participate in a

controlled exchange prior to the arrest.  With this argument, Defendant insinuates that a

controlled purchase never would have occurred, because Defendant was not at Wal-Mart to

retrieve heroin, but rather to take back five speaker boxes from the CS.  However, Defendant's

argument is flawed.  The arresting officers had to formulate a plan within the confines created by

the content of the text messages.  Unlike most controlled exchanges, which involve drugs in

---

[3] Having heard the recording, the Court agrees with the Government's characterization of the CS's tone when he asked this question.

exchange for money, the agreement between the parties here was for the CS to return five ounces of heroin to Defendant in exchange for nothing.  Without any money exchanging hands, allowing the CS to hand Defendant five ounces of heroin would have done nothing to further establish probable cause, because the officers would have no evidence of the value of the item the CS was returning to Defendant.  Without any evidence of monetary value of the item the CS was returning, Defendant would still be free to argue that he expected to receive speaker boxes from the CS, and had no idea that the item the CS handed him was, in fact, heroin.

Defendant also contends that the officers lacked probable cause because the CS was inherently unreliable.  At the hearing, defense counsel insinuated through cross examination that it was unreasonable for the officers to rely upon the word of the CS, given his status as a convicted felon and obvious heroin dealer.  While it is true that one's criminal history and/or contemporaneous criminal conduct often bears upon their reliability and veracity, a substantial body of case law attesting to the enhanced trustworthiness of a known – as opposed to confidential –  informant undermines the defense's suggestion that the officers should have discredited the CS's information.

In *Illinois v. Gates*, 462 U.S. 213, 230-34 (1983), the Supreme Court set forth a totality-of-the-circumstances test for evaluating whether a confidential informant's tip establishes probable cause, requiring consideration of an informant's veracity, reliability, and basis of knowledge.  There, the Court observed that certain characteristics of an informant's tip render it more reliable:

> [I]f an unquestionably honest citizen comes forward with a report of criminal activity – which if fabricated would subject him to criminal liability – we have found rigorous scrutiny of the basis of his knowledge unnecessary.  Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged

> wrongdoing, along with a statement that the event was observed first-hand, entitles his tip
> to greater weight than might otherwise be the case.

*Id*. at 233-34.  The Supreme Court has since recognized that, in contrast to a confidential

informant who provides an anonymous tip, a "known informant . . . can be held responsible if

her allegations turn out to be fabricated."  *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (citing

*Adams v. Williams*, 407 U.S. 143, 146–147 (1972)).  The circuit courts have interpreted *Gates*

and *J.L.* to mean that an informant who makes his identity known to police is inherently more

reliable than an anonymous tipster.  *See*, *e.g.*, *United States v. Jenkins*, 313 F.3d 549 (10th Cir.

2002) (informant who had two face-to-face meetings with police and provided his first name

"would realize that in all likelihood the police could, if they so chose, determine [his]  identity,

and could hold him responsible if his allegations turned out to be fabricated.   This provides a

disincentive for making false allegations and a court can consider this factor in weighing the

reliability of the tip.").

In the instant case, while the CS's criminal conduct certainly was a factor for officers to

consider in weighing his veracity, the officers were also aware that he had a substantial

"disincentive for making false allegations."  *See Jenkins*, 313 F.3d at 549.  After being found

with a large quantity of heroin, cash, and a firearm, the CS agreed to cooperate in the officers'

investigation.  It can be assumed that he did this in the hopes that he would receive lenient

treatment in exchange.  Much like the informant in *Jenkins*, who the Tenth Circuit found to be

reliable because (1) he made self-incriminating statements about his own involvement in the

offense, and (2) he provided information the police could use to "hold him responsible if his

allegations turned out to be fabricated," 313 F.3d at 554-55, the CS in the instant case had every

reason to tell the truth.  While the Court agrees that someone in the CS's position might be

inclined to minimize his own role in the offense and exaggerate the culpability of others, it is simply not plausible that he would have concocted a detailed story implicating an innocent salesman of speakers in a heroin trafficking crime, given the consequences he likely would have suffered as a result.

In conclusion, the facts and circumstances known to the arresting officers in this case established probable cause to arrest Defendant.  These facts and circumstances include the information provided by the CS, which was corroborated by the text message records he provided to police, as well as Defendant's arrival at the Wal-Mart parking lot, when officers observed that he and his vehicle – described by Officer Reyes as a car rarely seen on roadways – both matched the physical description the CS provided.

## II.      Motion to Suppress Statement

### A.      Applicable Law

The waiver of one's Fifth Amendment privilege against self-incrimination must be knowing, voluntary and intelligent.  *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008).  This standard requires that Defendant's relinquishment of his right was "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  *United States v. Curtis*, 344 F.3d 1057, 1066 (10th Cir. 2003) (internal citations and quotations omitted).  Moreover, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*

The Court must determine the voluntariness of a *Miranda* waiver "based upon the totality of the circumstances, considering 'both the characteristics of the accused and the details of the interrogation.'" *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (quoting *United*

*States v. Toles*, 297 F.3d 959, 965-66 (10th Cir. 2002)).  When engaging in the requisite totality-of-the-circumstances analysis, the Court must consider various factors.  These factors include: "(1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment."  *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999). "No single factor is determinative . . . [but] a confession is only involuntary when the police use coercive activity to undermine the suspect's ability to exercise his free will."  *Id*. at 1004 (quotation omitted).  The Government bears the burden of showing by a preponderance of the evidence that a confession is voluntary.  *Lopez*, 437 F.3d at 1063 (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004)).

### B. Testimony Regarding the Facts Surrounding Defendant's Arrest and Confession

Following Officer Reyes's testimony, the Government called DEA Special Agent Rey Rodriguez, who testified regarding the events surrounding Defendant's arrest and the subsequent search of his home.  According to Agent Rodriguez, Defendant parked his car in the Wal-Mart parking lot two to three spaces away from the CS's car.  As he exited his car, at least four of the twelve officers present yelled, "Police, police," 7/12/12 Hr'g Tr. (afternoon) at 23:18-22[4], and they approached Defendant with their weapons drawn.  The other eight agents were in the immediate vicinity, but did not approach Defendant directly because they were securing the scene.  Although Defendant momentarily appeared to attempt to run, he nearly immediately submitted and went to the ground.  Agent Rodriguez then handcuffed Defendant.  Another

---

[4] This Memorandum Opinion and Order cites to the court reporter's unofficial transcript.  Page and line numbers are subject to change on the official version.

officer – Group Supervisor Eduardo Chavez – told Defendant he was under arrest for a drug offense.  Defendant provided written consent for the officers to search his residence.

Upon arriving at Defendant's home, Supervisor Chavez read him his *Miranda* rights. Defendant did not appear confused or under the influence, nor did he complain of hunger or any physical discomfort.  The officers gave him a cup of water.  They asked him about his involvement in drug trafficking and he denied such involvement.  He stated that he arrived at Wal-Mart to help a friend who was experiencing car trouble, and he initially made no mention of an agreement to return five speakers.  Agents located a receipt for rent that appeared to exceed Defendant's income, and he explained that he made extra money on the side through interior remodeling and installation of wood floors.  The officers then confronted Defendant about his text message exchange with the CS, and he explained that the messages concerned speakers he was supposed to build for the CS.  Agents did not observe any materials in Defendant's home that appeared to be for the construction of speakers.

According to Officer Reyes, following the search of Defendant's home, agents transported him to the DEA headquarters in Albuquerque, where Defendant was placed in a holding cell.  Typical holding cells are climate-controlled, and equipped with a toilet, water fountain and bed.  Officer Reyes testified that he and DEA Special Agent Brian Bridgeford removed Defendant from his cell and began interviewing him in an interview room at roughly 2:00 a.m. on December 16, 2011 at the DEA office. Officer Reyes placed a thick file on the table in front of Defendant and told him it pertained to the DEA's investigation of the case.[5]  Officer

---

[5] Officer Reyes did not remember telling Defendant the file pertained exclusively to him, as opposed to the DEA's general investigation of a heroin trafficking ring.  Based on the officer's testimony, it appears that he was vague as to the precise contents of the file, but Defendant reasonably believed that the officer was telling him that the entire file pertained to an investigation of Defendant.

Reyes read Defendant his *Miranda* rights prior to initiating questioning.  He then confirmed that Defendant understood his rights, was not under the influence of drugs or alcohol, and understood English.[6]  The agents never had any doubt that Defendant spoke and understood English, and Defendant appeared to understand everything the agents said.

Having confirmed that Defendant understood his rights and was not under the influence, the agents proceeded to question him.  At no point in the interview did Defendant state he was hungry or in pain, nor did he attempt to end the interview.  Although the agents wanted to let Defendant speak freely so as not to curtail the information he was providing, they had trouble keeping him focused.  For example, Defendant spent ten to fifteen minutes discussing discrimination he had faced due to his appearance.  He also discussed an accident in which he was involved years prior.  He further told the agents that he had a son, whom he loved. Defendant informed agents that he was a non-citizen and asked if he would be deported if he were convicted of the offense for which he was arrested.  Officer Reyes responded that Defendant could be deported.  Officer Reyes testified that it was Defendant, not the officers, who brought up these topics.

When the agents directed Defendant to the events leading up to his arrest, Defendant began answering their questions but then quickly digressed to other topics.  Although Defendant was highly distracted and appeared nervous, he did not appear to be under the influence of any drugs or alcohol.  The agents continued to direct him back to the events of that evening. Defendant initially claimed that he arrived at Wal-Mart to meet the CS, who was to return five audio speakers to him.  However, due to the shifting nature of the story and Defendant's difficulty focusing on the agents' questions, and in light of Officer Reyes's specific training in

---

[6] Defendant stated that he understood English "pretty well."  7/12/12 Hr'g Tr. (afternoon) at 34:25-35:1.

detecting deception – which he received through trainings on the Reid method of interrogation – the officer believed Defendant was being dishonest.  After 43 minutes, Agent Bridgeford stood up to terminate the interview due to his belief that Defendant was being dishonest.  At that point, Officer Reyes asked Defendant if he in fact went to Wal-Mart to pick up five ounces of heroin. He observed Defendant look down and put his head in his hands.  Defendant then admitted that he was indeed at Wal-Mart to retrieve heroin, not speakers, and Officer Reyes perceived Defendant to be honest.  Defendant proceeded to confess to the offense and more generally describe his involvement in the heroin business.

At no point during the interview did either officer use physical force against Defendant. Officer Reyes testified that they never threatened Defendant at all – not with the prospect of discrimination in prison nor of never seeing his family again.  Although the officers never expressly offered Defendant anything to eat or drink, they did ask him if he needed anything, to which he responded in the negative.  Furthermore, as he was not handcuffed or restrained, he was free to go to the water fountain in his holding cell, which was in close proximity to the interview table.

Following the officers' testimony, the defense called Defendant to testify on his own behalf.  He explained that he was born in Israel and moved to the United States when he was around five years old.  Although his family lived in the U.S., they maintained a distinct culture and value system whereby Defendant was taught not to question authority figures.  He was in special education classes throughout his schooling and always had trouble with the English language.  He was in a serious car accident at age seventeen and consequently completed high school through a night school program.  He vaguely described confusion and fogginess that

17

resulted from his accident, but it does not appear that Defendant sustained a permanent brain injury.

With respect to the date of his arrest, Defendant testified that he did not feel well when he woke up in the morning.  He took a pill at his girlfriend's suggestion, to later realize it was a 30-milligram Adderall.  The Adderall made him jittery and shaky, but because he was afraid of the comedown, he took another, and yet another.  After that, he "felt like [his] heart was just pounding 100 miles an hour," 7/12/12 Hr'g Tr. (afternoon) at 66:4-5, which was particularly uncomfortable and nerve-wracking for him because he had never done drugs before.

Defendant next testified that when he arrived at the Wal-Mart parking lot, he parked so that the nose of his vehicle was facing the nose of the CS's vehicle, in order to give the CS a jump start.  Upon exiting his vehicle, he saw "a bunch" of agents running towards him with guns. *Id*. at 68:21.  When he heard, "Police, police," he could not drop immediately to the ground because he has a fused hip – according to Defendant, "my femur and my pelvis is one bone." *Id*. at 69:6.  Instead, Defendant knelt on his knees, at which time he felt the barrel of a gun on his neck, and he was pushed to the ground.  He saw at least eight agents surrounding him, one of whom eventually helped him up.  Agent Rodriguez told Defendant that he "needed" to sign a consent-to-search form, because the agents were "going to" search his home. *Id*. at 71:23-25.  It was too dark for Defendant to see the contents of the form, nor did Defendant know the meaning of the word "consent," but he nonetheless signed the form because the officers told him to do so.

After Defendant signed the consent-to-search form, agents transported him to his residence.  According to Defendant, while in the car on the way to his house, Group Supervisor Chavez asked him where he was from, and he replied that he was from Israel.  Group Supervisor

Chavez responded, "How do you people take it when you guys are called a fuckin' Jew?"  *Id*. at

75:18-19.  In light of this question, Defendant believed himself to be the victim of

discrimination.  Defendant proceeded to describe the officers' tone with him during the search of

his home, testifying that they yelled at him and used profanity.  In this manner, they accused him

of hiding drugs and guns in his apartment and of withholding information.

 After terminating the interview in Defendant's home, the agents took him to the DEA

office.  He was placed in a very cold holding cell, and Officer Reyes apologized for the cold

temperature, explaining the heat was not working properly.  Nonetheless, Officer Reyes took

Defendant's shoes from him, and Defendant was not wearing socks.  Two hours later, Officer

Reyes removed Defendant from the holding cell and brought him into the interview room, where

the officer "slammed" a file folder onto the table and told Defendant he had been investigating

him for two years.  *Id*. at 83:13.  He read Defendant his rights and told Defendant to disclose

everything he knew.  Officer Reyes brought up the topic of Defendant's son and told Defendant

he was looking at twenty years and might never see his son again.  It was also the officer who

brought up the topic of discrimination, warning Defendant that "they don't like Jews in prison."

*Id*. at 91:25-92:1.  He then said, "You better talk to me, you better tell me what I want to hear."

*Id*. at 85:11-12.

 Officer Reyes proceeded to ask Defendant why he was at Wal-Mart that night, to which

Defendant responded he was there to give the CS a jump start.  Officer Reyes told Defendant that

this was "bullshit" and to "stop fucking with him."  *Id*. at 86:3-4.  The officer stood up, placed

his hands on the table, and leaned over Defendant, continuing to use profanity and accuse

Defendant of lying.  Defendant stated this interaction continued for twenty minutes.  Officer

Reyes told Defendant that they needed to "meet in the middle" so that everyone could go home, as it was 3:30 in the morning.  *Id*. at 88:10.  One of the officers told Defendant they might let him go if he told them the truth; the other officer told Defendant that he would get a lighter sentence if he cooperated with them.  After the enormous pressure the officers placed on him, Defendant was exhausted and decided to "tell them what they wanted to hear."  *Id*. at 89:3-4.  He admitted that he was in fact at Wal-Mart to retrieve five ounces of heroin from the CS, and that the term "speakers" was code for heroin. Defendant described the interrogation as "traumatic."  *Id*. at 85:11-12.

Instead of calling the last defense witness, Defendant's sister Sagit Frasier, the parties agreed to an offer of proof regarding the substance of her testimony.  They agreed that Ms. Frasier would testify that due to the culture and values with which Defendant was raised, he is highly deferential to authority figures.  In addition, as a child he was bullied and subjected to beatings by other children.  He has always had learning difficulties and has suffered two serious accidents, after which he was mentally slower.

**C.**     **Testimony of Professor Deborah Davis**

Following Defendant's testimony, the defense presented Dr. Deborah Davis, a professor of psychology at the University of Nevada, Reno, and proffered her as an expert witness on the subject of false confessions.  The Government objected to Dr. Davis's testimony on grounds that she was unqualified to testify and that her entire field of study has been called into question.  The Court overruled the Government's objection.  Having listened to Dr. Davis's testimony, and further having reviewed it on the unofficial transcript, the Court has concluded that Dr. Davis's testimony does not conform to the requirements of *Daubert* and Rule 702 because it was

ultimately unhelpful. Accordingly, the Court will not consider Dr. Davis's testimony in its resolution of the Motion to Suppress.

### 1.        Substance of Dr. Davis's Testimony

After setting forth her credentials, Dr. Davis described studies she personally conducted on false confessions.  She ultimately stated that based on her studies, she believes that a high percentage of people falsely confess when presented with the Reid method of interrogation.  She explained that her own studies as well as the entire field of research regarding false confessions have found that the Reid method teaches interrogators to make implicit threats and promises that the law prohibits them from making explicitly, so as not to "violat[e] the technicalities of the law."  7/12/12 Hr'g Tr. (afternoon) at 164:10. She described the method as "very brilliant psychology of getting somebody to comply with what you're asking them to do," *id*. at 163:8-9, whose purpose is "to convince them that [] no one is ever going to believe that they're innocent and that they're hopelessly caught."  *Id*. at 128:2-4.  She proceeded to offer a list of factors that might make any particular interrogation highly stressful to the subject of the questioning, consequently presenting danger of a false confession.  Dr. Davis also testified regarding her research on the effects of Adderall.

### 2.        Applicable Law

Rule 702 of the Federal Rules of Evidence "imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions."  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001) (citing *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993)).  The Court retains broad discretion in assessing an expert's

reliability and making its ultimate determination of reliability.  *Atty. Gen. of Okla. v. Tyson Foods, Inc*., 565 F.3d 769, 779 (10th Cir. 2009) (citations omitted).

In order to determine whether an expert's opinion is admissible, the Court must undergo a two-step analysis, first assessing reliability, and then assessing whether or not the proffered evidence will assist the trier of fact.  *Ralston*, 275 F.3d at 969; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006).  In the reliability prong, the Court must determine whether the expert is "qualified by 'knowledge, skill, experience, training, or education' to render an opinion."  *Ralston*, 275 F.3d at 969 (quoting FED. R. EVID. 702).  If the expert is so qualified, the Court must assess helpfulness by determining whether his opinions are relevant under the principles set forth in *Daubert*.  *Id*.

If the reliability prong is satisfied, the Court then must consider other non-exclusive factors to determine whether the testimony will assist the trier of fact.  *Rodriguez-Felix*, 450 F.3d at 1123 (summarizing factors as follows: "In essence, the question is whether the reasoning or methodology properly can be applied to the facts in issue." (quoting *Daubert*, 509 U.S. at 593)).  Where, as here, the trier of fact is a judge and not a jury, "*Daubert's* standards must still be met, [but] the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise . . . ."  *Tyson Foods*, 565 F.3d at 779.  In *Tyson Foods*, which involved a bench trial, the Tenth Circuit held that the trial court did not abuse its discretion when it first admitted the expert's testimony and subsequently found it to be unreliable.  *Id*. at 780.  This is because in contrast to a jury, a judge "maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation."  *Id*.

### 3.    Analysis

Assuming without deciding that the testimony of Dr. Davis meets *Daubert's* reliability requirement, it nonetheless did not assist the Court.  First and foremost, the issue in the instant case is whether or not Defendant's confession was *coerced*, not whether or not it was *false*.  Dr. Davis's primary field of study is indeed *false* confessions, and her testimony focused primarily on that topic.  When asked specifically about her research on *coerced* confessions, she responded:

> [T]o conduct research on a coerced confession is not something that a psychologist would look at . . . .  Our assumption is that if you have things that really up the rate of false confessions, that that's likely to be something that's quite coercive because why would a person falsely confess?  If they weren't, you know, feeling coerced in some way or they weren't crazy . . . .  So – [coercion] is a legal term more than a psychological term.

7/12/12 Hr'g Tr. (afternoon) at 133:14-134:4.  Secondly, Dr. Davis offered her own standards for assessing whether certain factors of the interrogation amounted to unlawful coercion, without regard to the fact that the law on the matter espouses a different set of standards.  For example, she opined that one who comes from a culture that emphasizes respect for and obedience to authority, would be more inclined to confess falsely.  She also stated that notwithstanding the objective temperature of a room, someone under the stress of having been arrested for a criminal offense might subjectively feel the room is much colder, which would make them more susceptible to coercion.  In this sense, her testimony would imply that anyone arrested for a criminal offense is dangerously susceptible to coercion.  Because there is no basis in the law for concluding that Dr. Davis's proffered factors would generally create an atmosphere of coercion, and indeed the law sets forth its own distinct set of factors to govern this inquiry, the Court found this aspect of Dr. Davis's testimony to be unhelpful.

23

With respect to the reminder of Dr. Davis's testimony, the Court found that it evidenced a generally slanted approach to the topic of false confessions.  On direct examination, Dr. Davis stated that subjects often falsely confess just to escape the interrogation.  Towards the end of cross-examination, counsel for the Government asked Dr. Davis why, in a situation where interrogators began to leave the room and terminate the interrogation, an individual would confess just to escape.  Dr. Davis stated that it "really depends on what they say when they're going out the door."  *Id*. at 183:23-24.  For example, if the interrogator indicates that he is frustrated with the subject's responses and says, "I might as well go home to my wife and turn you over to the D.A.," *id*. at 184:4-5, a subject might be more inclined to offer a false confession even though the interrogation is technically concluding.  Dr. Davis repeated this example – the interrogator leaving to go home to his wife because he is tired of the subject lying – a number of times.  Counsel reminded her that such a scenario never occurred in this case, no matter whose testimony one was to believe.  Dr. Davis agreed, but added that in *any* situation where a subject first denies involvement and then confesses, "I would think it would be highly likely they did the usual and told them, I'm through, I'll turn you over to the D.A. and let them take care of you." *Id*. at  185:14-16.  She then stated that in this case, "[T]hat's how I think it probably happened," *id*. at 21-22, and the Court sustained a Government objection to this statement.  This exchange on cross examination highlights Dr. Davis's general skepticism of the notion that any confession following an interrogation could be legitimate, as opposed to the product of coercion or other aggressive tactics.

Furthermore, although Dr. Davis insisted that she was not present to render an opinion as to what actually occurred, her opinion was based exclusively on Defendant's version of the facts.

24

She denied adopting Defendant's story, but rather emphasized that *if* his version of the events were true, the circumstances were likely to produce a false confession. It appeared that Dr. Davis was unwilling to entertain the possibility that the officers were testifying truthfully, as she essentially all but refused to respond to the Government's hypothetical questions based on the officers' version of the facts.  *See*, *e.g.*, 7/12/12 Hr'g Tr. (afternoon) at 183:3-12 ("Q: In a situation, though, where the police themselves terminate the interview, it's over, isn't it?  The police themselves say, you know what, we're done, isn't that correct?  A: Well, I don't know what actually happened.  I heard what [the officers] said.  I also know the training is, . . . I can't help you if you don't tell me the truth, I have got my wife and kid at home . . . ."); *id.* at 185:8-16 ("Q: So in that situation, why would somebody confess just to escape if they've already been, if the interview is over?  A: I guess, the only thing that I can say is they might not, but . . . I would think it would be highly likely they did the usual and told them, I'm through, I'll turn you over to the D.A. and let them take care of you.").

In *United States v. Benally*, 541 F.3d 990 (10th Cir. 2008), the Tenth Circuit affirmed the district court's decision to disallow Dr. Davis's testimony on the same topic at issue in this case. The court reasoned that although "Dr. Davis would not have opined as to whether she believed [the defendant] confessed falsely, with or without the opinion, the import of her expert testimony would be the same: disregard the confession and credit the defendant's testimony that his confession was a lie."  *Id.* at 995.  To be clear, the danger of confusion and prejudice to the Government is not present here as it would be in a jury trial.  However, having heard Dr. Davis's testimony, the Court believes that *Benally's* description of the purpose and effect of the testimony applies to this case as well.  The testimony is therefore improper under *Daubert*.

### D.      Defendant's Confession Was Not the Product of Undue Coercion

As is evident from this summary of the testimony, the facts leading up to and surrounding Defendant's confession are hotly disputed.  The account that Officer Reyes and Agent Rodriguez provided of Defendant's arrest and subsequent interrogation cannot be reconciled with Defendant's own version of these events.  In light of the calm and relaxed demeanor to which the officers testified, and the yelling and overt threats to which Defendant testified, the Court's conclusion rests substantially upon its credibility findings.  Ultimately, the Court found the officers to be credible witnesses with respect to the facts that are determinative of the question of voluntariness. They testified consistently with one another as to events in which they both participated.  While the officers did not remember with the utmost precision every detail of the events that occurred seven months prior, nor did Officer Reyes include every minute detail in his arrest and investigation report, the Court nonetheless found the general thrust of the officers' testimony to be credible.  Having weighed the conflicting testimony, the Court concludes that Defendant's account of overt threats, ethnic slurs, and promises of leniency is not credible.

Although Defendant did not appear to be lying, parts of his story did not line up.  He emphasized his learning difficulties and his struggles with English; however, he spoke English flawlessly on the witness stand and his only detectable accent was a New England one.  He claimed that he did not know the meaning of the word "consent," but he stated that he underwent at least three serious medical procedures, at which time he must have been at least minimally exposed to the concept of informed consent.  In addition, he claimed to never have used drugs before in his life, yet he took multiple Adderall despite his dislike for the drug's effects, so as to avoid the "comedown."  It is difficult to believe that one who had never been high and come

26

down before, would nonetheless be so afraid of the comedown that he would continue to take a drug whose effects he so disliked.

As noted above, in making its voluntariness determination, the Court must consider the following non-exhaustive list of factors: "(1) the defendant's age, intelligence, and education; (2) the length of the detention and interrogation; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to or threatened with any physical punishment." *Lugo*, 170 F.3d at 1004.  The Court does not doubt that certain aspects of Defendant's story – including his description of the agents' tone, their use of curse words, and Officer Reyes' insinuation at the commencement of the interrogation at the DEA headquarters that his entire file pertained to Defendant – accurately conform to Defendant's perception of the events. Assuming without deciding that these events happened as Defendant claims they did, the Court nonetheless concludes that his confession was voluntary and was not the product of coercion.

The Court first looks to Defendant's characteristics, remaining mindful that, "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Colorado v. Connelly*, 479 U.S. 157, 165 (1986).  Defendant is a 38-year-old high school graduate who has lived in the United States since he was five years old.  The command of the English language that he exhibited at the hearing precludes a finding that his difficulties with English contributed to an atmosphere of coercion.  *See id.* at 1004-05 ("While Mr. Lugo's first language is Spanish and he received a ninth grade education, his responses to Trooper Shields' questions demonstrated sufficient understanding of the English language for purposes of the

interrogation"). Nor did Defendant come across as particularly slow.  He struggled with certain terms and concepts – for example, he stumbled over the acronym "ADHD" when describing why his girlfriend takes Adderall – but he rarely appeared confused by the questions directed at him even though neither party appeared to tailor their questions to someone with a low level of intelligence.  The facts that Defendant took special education classes and graduated late from high school simply do not support a finding that his intellectual capacity was so low as to render him unusually susceptible to coercion.  *See United States v. Morris*, 247 F.3d 1080, 1090 (10th Cir. 2001) (defendant's age (19 years old) and level of education (tenth grade) supported district court's finding that confession was voluntary because defendant had "sufficient intelligence, maturity and sophistication to understand the circumstances in which he found himself").

Even if Defendant was under the influence of Adderall at the time of his confession, this would not automatically render his confession involuntary.  As explained, Defendant's statement that this was the first time he had ever tried Adderall – or any drug for that matter – is not credible.  Both agents testified that Defendant did not appear to be under the influence of drugs or alcohol during the interview, notwithstanding his difficulty remaining focused.  While Adderall could still affect Defendant's functioning, these effects would not be so extreme as to render his confession involuntary based solely on the impairment caused by the Adderall.  *See*, *e.g.*, *United States v. Reynolds*, 367 F.3d 294 (5th Cir. 2004) (suspect's testimony that he had not slept for three days prior to interrogation and had taken methamphetamine prior to arrest did not render confession involuntary); *United States v. Coleman*, 208 F.3d 786 (9th Cir. 2000) (although symptoms of heroin withdrawal caused lethargy and physical discomfort, they were insufficient to establish involuntariness of confession)

28

Nor do the aspects of Defendant's childhood to which his sister testified render him unusually susceptible to coercion.  Defendant has not advanced any authority that would support a finding that his upbringing, which emphasized deference to and respect for authority figures, rendered him significantly more susceptible to coercion than the average person.  In addition, his status as a citizen of Israel is an objective fact that the agents were not required to ignore when Defendant asked about the possibility of deportation.  The agents' discussion of deportation – which would consequently present the possibility that Defendant would never again see his son – did not constitute coercion.[7]

The Court now turns to the characteristics of the detention and interrogation.  It is undisputed that the agents advised Defendant of his constitutional rights.  Defendant does not allege that the agents threatened to physically punish him.  In addition, the interrogation lasted 43 minutes.  While the 2:00 a.m. hour of the interview is a factor to consider, this combined with the duration of the interview nonetheless did not create an atmosphere of coercion.  *See Lugo*, 170 F.3d at 1004 ("Mr. Lugo was not subjected to an unreasonably long detention and interrogation. The delay from 1:00 a.m., when Mr. Lugo was arrested, until 5:45 a.m., when the interview took place, is not presumptively prejudicial."); *cf. Lopez*, 437 F.3d at 1065 (finding that confession was coerced notwithstanding factors that mitigated coercive circumstances, including that interrogation lasted only one hour).

With respect to the nature of the questioning, the Court finds that the extent of pressure the agents exerted upon Defendant was proper.  Although the agents may have used profanity and yelled at Defendant, this would not render his confession involuntary unless his will was

---

[7] The Court did not find Defendant's assertion credible that the agents threatened him with deportation, never seeing his son again, and abuse in prison due to his religious and/or ethnic identity.

overborne.  *See Lugo*, 170 F.3d at 1004 ("a confession is only involuntary when the police use coercive activity to undermine the suspect's ability to exercise his free will").  Numerous courts have found that agents' raising of their voices and their use of profane language are insufficient factors to support a finding of involuntariness.  *See*, *e.g.*, *Cunningham v. City of Wenatchee,* 345 F.3d 802, 806, 810 (9th Cir. 2003) (confession not coerced when, during eight-hour interrogation, officer raised his voice, called suspect a liar and said he knew that suspect committed the offense);  *United States v. Jones*, 359 F.3d 921, 924 (7th Cir. 2004) (confession not coerced when, although interrogators yelled at mentally ill defendant and displayed weapon, mitigating factors were present: interrogation lasted one hour, defendant was informed of his rights, defendant never requested but was never denied beverages, phone calls or food, and interrogators used no physical violence); *United States v. Twiddy*, No. 07-CR-00259-EWN, 2007 WL 3256649 (D. Colo. Nov. 2, 2007) (agent's tactics, including raising his voice and use of profanity, did not cause defendant's will to be overborne); *United States v. Flowers*, No. 05-40025-01-RDR, 2005 WL 1799195 (D. Kan. June 17, 2005) (use of strong language, including profanity, insufficient to overcome defendant's will).

Finally, Officer Reyes's insinuation that he had a two-year-old case file on Defendant did not render Defendant's confession involuntary. The Tenth Circuit has stated that well-settled law permits agents to exaggerate the strength of their case.  *Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997) (quoting 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.2, at 446–47 (1984) ("Although dictum in *Miranda v. Arizona* was highly critical of police trickery and deception, as a general matter it may be said that courts have not deemed such conduct sufficient by itself to make a confession involuntary. One type of trickery involves

30

misrepresenting to the suspect the strength of the existing case against him.")); *see also United States v. Charles*, 476 F.3d 492, 497 (7th Cir. 2007) (trickery, active misleading, deceit, and impersonation are permissible interrogation tactics).  Defendant has not advanced authority to support his argument that Officer Reyes's actions with respect to this file amounted to coercion.

## CONCLUSION

It is **HEREBY ORDERED** that the Defendant's Motion to Suppress Evidence and Memorandum in Support Thereof (Doc. 50) and Motion to Suppress Statement and Memorandum in Support thereof (Doc. 51) are **DENIED**.


Dated this 19th day of September, 2012.


_____
**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**


*Attorney for Plaintiff:*
Nicolas Jon Ganjei

*Attorney for Defendant:*
Erlinda Ocampo Johnson